UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ROBERT CHRISTOPHER YOUNG, JR., | § | |
| individually; and LASHUN FUQUA, as | § | |
| independent administrator of and on behalf of | § | |
| the ESTATE OF LONNETTA JOHNSON, | § | |
| and LONNETTA JOHNSON's heir(s)-at-law, | § | |
| | § | CIVIL ACTION NO. _____ |
| Plaintiffs, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| HARRISON COUNTY, TEXAS; and | § | |
| SOUTHERN HEALTH PARTNERS, INC. | § | |
| A/K/A SHP, | § | |
| | § | |
| Defendants. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **Medically and mentally ill pre-trial detainee Lonnetta Johnson died an unnecessary and preventable death after incarceration in the Harrison County jail as a result of Defendants' policies, practices, and/or customs. Lonnetta died after being in the same position, unclothed, on a cold cell floor for hours, without any intervention.**



Table of Contents

I.      Introductory Allegations ...................................................................................4

    A.    Parties.........................................................................................................4

    B.    Jurisdiction and Venue...............................................................................6

II.     Factual Allegations ...........................................................................................6

    A.    Preliminary Statement.................................................................................7

    B.    Lonnetta's Prior Incarceration in the Harrison County Jail .........................8

    C.    Lonnetta's Suffering and Death Resulting from Incarceration in the
        Harrison County Jail ..................................................................................15

        1.    Texas Rangers Investigation ..........................................................16

        2.    Texas Commission on Jail Standards Investigation..........................25

        3.    Custodial Death Report (Filed with Attorney General) ......................26

        4.    Inmate Death Report (Filed with TCJS) ..........................................29

        5.    Medical Records ............................................................................30

            a.    EMS Records ........................................................................30

            b.    Hospital Records...................................................................31

            c.    Autopsy Reports....................................................................32

    D.    Liability of Harrison County and Southern Health Partners...........................33

        1.    Introduction....................................................................................33

        2.    Southern Health Partners' Agreement and Partnership with Harrison
            County to Provide Medical and Mental Health Care Services to
            Harrison County Detainees ..............................................................35

        3.    Non-Delegable Constitutional Duties, Respondeat Superior, and
            Qualified Immunity Unavailability....................................................39

        4.    Harrison County and/or Southern Health Partners Policies,
            Practices, and Customs ...................................................................41

        5.    TCJS Records Demonstrating County Practices and/or Customs .......44

        6.    Harrison County Jail - Suffering and Death of Other Detainees .........49

III.    Causes of Action ..............................................................................................50

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective
        Reasonableness Pursuant to *Kingsley v. Hendrickson* .....................................50

    B.    Remedies for Violation of Constitutional Rights............................................52

    C.    Cause of Action Against Harrison County and SHP Under 42 U.S.C. §
        1983 for Violation of Constitutional Rights ...................................................52

IV.   Concluding Allegations and Prayer ........................................................................55

    A.   Conditions Precedent .........................................................................55

    B.   Use of Documents at Trial or Pretrial Proceedings .........................55

    C.   Jury Demand .....................................................................................55

    D.   Prayer ................................................................................................55

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Robert Christopher Young, Jr. ("Robert" or "Mr. Young") is a natural person who is the biological and legal son of Lonnetta Johnson. Lonnetta Johnson is referred to herein at times as "Ms. Johnson," "Lonnetta," or the "decedent."  Robert Young sues in his individual capacity and seeks all damages and remedies available to him as a wrongful death beneficiary and/or heir.

2.      LaShun Fuqua ("Mr. Fuqua") sues as the independent administrator of the Estate of Lonnetta Johnson, Deceased.  LaShun Fuqua, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of all wrongful death beneficiaries (including Mr. Young). All people in the immediately preceding sentence, excluding Mr. Fuqua, are collectively referred to herein as the "Wrongful Death Beneficiaries." Mr. Fuqua asserts claims on behalf of and seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiares.  He also sues in that capacity asserting claims on behalf of the estate and all of Lonnetta's heirs (including Mr. Young). All people in the immediately preceding sentence, excluding Mr. Fuqua, are collectively referred to herein as the "Claimant Heirs."  Mr. Fuqua asserts claims on behalf of and seeks all survival and other damages available under law to the Claimant Heirs. Letters of independent administration were issued to LaShun Fuqua in or about February or March 2023, in Cause Number 2022-18671-CCL, in the County Court at Law of Harrison County, Texas, in a case styled *Estate of Lonnetta Johnson, Deceased.*

3.    Defendant Harrison County, Texas ("Harrison County" or the "County") is a Texas county.  Harrison County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Chad Sims, at #1 Peter Whetstone Square, Room 314, Marshall, Texas 75670, or wherever Honorable County Judge Chad Sims may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  The County acted or failed to act at all relevant times through Southern Health Partners, Inc. and County employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).  The County's policies, practices, and/or customs were moving forces behind, and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages (including death) referenced in this pleading.

4.    Defendant Southern Health Partners, Inc. a/k/a SHP (sometimes referred to herein as "Southern Health Partners" and/or "SHP") is a Delaware corporation.  Before an assumed name certificate expired in Texas in or about year 2018, originally filed in or about June 2008, SHP was also doing business as "SHP Vista Health Management, Inc."  SHP may be served with process by serving its registered agent for service of process, CT Corporation System, at its registered office, 1999 Bryan St., Suite 900, Dallas, Texas 75201.  Such service is in accordance with Federal of Civil Procedure 4(h)(1)(A), which provides that service of process may be made in the manner prescribed by Rule 4(e)(1) for serving an individual.  Rule 4(e)(1) provides that service on an individual may be made in the manner allowed by the law of the state in which the district court

in which the federal case is filed is located.  Service on the registered agent for service of process is provided by Texas law.  In addition, SHP may be served with process, pursuant to Rule (4)(h)(B), by delivering a copy of the summons and this complaint to an officer, or a managing or general agent, of SHP, wherever any such person may be found.  SHP, through its employees, agents, representatives, and/or chief policymakers, acted and/or failed to act at all relevant times, and it is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to vicarious liability law and law applicable to claims pursuant to 42 U.S.C. § 1983).  SHP acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations and resulting damages (including death) referenced in this pleading.

### B.    Jurisdiction and Venue

5.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over the County because it is a Texas county.  The court has personal jurisdiction over SHP because SHP's minimum contacts with Texas are such that SHP would expect to be subject to the court's jurisdiction. Venue is proper in the Marshall Division of the United States District Court for the Eastern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in the County, which is in the Marshall Division of the United States District Court for the Eastern District of Texas.

## II.    Factual Allegations

A.    Preliminary Statement

6.    Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claims have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done Plaintiffs' best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

7.    Plaintiffs plead facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiffs plead facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional claims but rather must merely plead facts which give rise to constitutional claims. Plaintiffs thus ask that the court apply the correct legal theory or theories to the facts pled.

8.    Plaintiffs are not pleading their "best case" and will only be able to do so after conducting discovery.  Plaintiffs do not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

B.    Lonnetta's Prior Incarceration in the Harrison County Jail

9.    Lonnetta Johnson died on January 13, 2022 as a result of significant neglect in the Harrison County jail. Lonnetta and her physical and mental health issues were not unknown to the Harrison County jail. She had been incarcerated in that jail several times before.

10.    There is no doubt that Harrison County, and upon information and belief SHP, were aware of Lonnetta's significant physical and mental health issues for years before the incarceration concluding in her death. They thus had to have in place appropriate policies, practices, and/or customs to deal with not only Lonnetta's significant issues, but issues of other detainees in the jail. Upon information and belief, Defendants had in their possession all documents referenced in this section below and creation of which preceded Lonnetta's final incarceration in the Harrison County jail.

11.    A jail medical intake form for May 28, 2011 indicates that Lonnetta had asthma, heart trouble, hypertension, diabetes, and mental illness. It also indicated that she had attempted suicide and contained a note indicating that Lonnetta had mental health issues, and would give answers to medical screening questions that were "yes," but would then change her mind several times for such a question. A note also indicated that Lonnetta was a patient/client of Community Healthcore. This, taken together with other information known to Defendants, indicated that Lonnetta had serious mental health issues. A note also indicated that Lonnetta had been diagnosed with schizophrenia. A Screening Form for Suicide and Medical and Mental Impairments indicated that Lonnetta had been very depressed and had even attempted suicide as a child through use of pills.

12.    A June 13, 2011 Screening Form for Suicide and Medical and Mental Impairments indicated that Lonnetta had received MHMR services for mental health issues. The Texas

Commission on Jail Standards ("TCJS") requires use of this form with every person who is booked into a county jail. Further, a Community Healthcore crisis assessment, dated the same date, indicated that Lonnetta had psychosis, had four psychiatric hospitalizations, and was diagnosed as having a schizoaffective disorder.

13.    A March 9, 2013 Screening Form for Suicide and Medical and Mental Impairments indicated that Lonnetta had received MHMR services for depression, and that she would hear noises or voices that other people don't seem to hear when she was not taking her medication. The form also indicated that Lonnetta was taking Metformin, Lisinopril, Seroquel, Topamol, and Invega. Lonnetta made a sick call request on March 11, 2013, asking for her blood pressure medication and medication for her mental illness.

14.    A    January    9,    2016,    Screening    Form    for    Suicide    and Medical/Mental/Developmental Impairments for Lonnetta contained additional information regarding Lonnetta's mental health issues. The form indicated that Lonnetta had been hospitalized in the prior 90 days for mental illness. The form also indicated that she had attempted suicide the "last time" she was in jail. She further indicated that she had PTSD and had related flashbacks. Lonnetta also said that she had received services for emotional and mental health problems through Wellness Pointe, and that she was bipolar.

15.    A February 14, 2016 medical intake information form indicated that Lonnetta had hypertension and diabetes, and that she was schizophrenic and also suffered from bipolar disorder. A Screening Form for Suicide and Medical/Mental/Developmental Impairments of the same date indicated that Lonnetta had received services for emotional or mental health problems, had been in a hospital for such issues in the prior year, and was diagnosed as being bipolar and having schizophrenia. The form also specified that Lonnetta was incoherent, disoriented, or showed signs

of mental illness. A handwritten note on the medical intake information form read that Lonnetta was "grossly psychotic." The note also indicated that Lonnetta, when at Community Healthcore, was on Seroquel XR, and that her diagnosis was schizophrenia.

16.     A February 16, 2016 Community Healthcore Crisis Reassessment form read in part that Lonnetta was in her cell with her pants off, having stuffed them down the toilet. When asked about her pants, she indicated that she flushed them down the toilet because she was sick of sleeping on the hard floor. It also read, "She stated that she went to the hospital to get help, but they brought her to the jail." The note also indicated that Lonnetta's thoughts would change subjects and be disconnected. The note concluded: "She stood at the window and talked to someone who was not there." In the "treatment recommendations" section, the licensed professional counselor indicated that Lonnetta appeared to be floridly psychotic. Moreover, Lonnetta was on the Rusk State Hospital wait list. Rusk State Hospital is located in Rusk, Texas and is an in-patient hospital providing psychiatric treatment and care, including psychiatric services. This includes maximum-security forensic psychiatric services for adults. Lonnetta's serious mental health issues precluded her from continuing to be incarcerated in the Harrison County jail. Defendant(s) had constitutional obligations, including those falling under the duty to protect Lonnetta, and could not shirk those obligations simply because a chosen hospital had a wait list for beds.

17.     A February 23, 2016 Community Healthcore Crisis Assessment form indicated that Lonnetta would shout in incomprehensible sentences while standing at the window of her cell. She was alert only to place, and she would point at the cell window and state, "That's Mary Magdalene. She has a red dot on her forehead." She also said that her feet were cold and said that she had

schizoaffective disorder. Lonnetta told a caseworker that she had taken Seroquel before, and mentioned six different doses.

18.     A handwritten note on a January 8, 2017 medical intake form read in part that Depakote would be resumed for Lonnetta, as well as Seroquel and Ativan. The note also indicated that Lonnetta needed to be transferred to the state mental health hospital. Once again, records provided by the County indicate that Lonnetta should not have been jailed but instead transferred to an appropriate in-patient mental health facility.

19.     A January 18, 2017 Community Healthcore Crisis Reassessment form indicated that Lonnetta was only oriented to self and place. Lonnetta was initially naked but would cover herself when requested by jail staff. Lonnetta was inappropriately tearful while smiling. A minute later, Lonnetta would stare, wide-eyed, and answer questions in a sing-song, up and down cadence. Lonnetta said that she had auditory hallucinations. The qualified mental health professional (QMHP) note read in part, "Client is a danger to self and meets hospitalization criteria due to acute psychosis rendering her judgment and reality testing severely impaired, and leaving her unable to care for herself."

20.     A January 30, 2017 Community Healthcore Crisis Assessment form indicated that Lonnetta was actively psychotic in the County jail. Lonnetta was unable to answer questions due to being distracted by internal stimuli. She was having multiple conversations in a whispered tone with different people who were not present. She was sexually inappropriate with statements she made while interacting with the mental health clinician and jail staff. Lonnetta was dancing, naked, in her cell during the assessment. She could at times be heard screaming while alone in her cell, and her mood would shift rapidly. Lonnetta would smile and then begin to cry. The mental health clinician recommended that Lonnetta remain on a Rusk State Hospital wait list. Thus, once again,

the County chose to incarcerate Lonnetta when she undoubtedly needed extensive in-patient mental health treatment.

21.    A July 25, 2017 County jail medical intake form for Lonnetta indicated that she had been treated for diabetes, epilepsy, and mental illness. The form further indicated that Lonnetta took medication for diabetes and her mental health issues. A suicide assessment form indicated that Lonnetta had received mental health services through Community Healthcore and Rusk State Hospital.

22.    A November 3, 2017 Screening Form for Suicide and Medical/Mental/Developmental Impairments indicated that Lonnetta would see and hear things that other people did not see and hear. Lonnetta also believed that someone could control her mind or thoughts, or read her mind, through voodoo. The form indicated that she had received services for emotional or mental health problems through a Dr. Murphy, and had been hospitalized for such issues in the prior year. The form further indicated that Lonnetta had been diagnosed with bipolar disorder and schizophrenia.

23.    As was true with virtually every incarceration of Lonnetta at the Harrison County jail, when a Screening Form for Suicide and Medical/Mental/Developmental Impairments indicated and/or described Lonnetta's serious mental health issues, that form was sent to a magistrate in accordance with Texas law. It was likewise sent to one or more mental health professionals working for the County, as well as a number of employees that were, upon information and belief, employed by the Harrison County Sheriff's Office. The November 3, 2017, form was, for example, emailed to Harrison County, Texas email addresses for the following people: Captain Hain, Jay Webb, Hugh Taylor, Charlene Graff, Joe Black, Brad Morin, Mike Smith, Megan Pinson, Clarice Watkins, Nancy George, Joan Lindsay, Paula Mooty, and Patricia

Binotti. A medication list dated November 3, 2017 indicated that Lonnetta was taking Seroquel for depression associated with manic depressive disorder.

24.     A jail medical intake form dated June 10, 2018 indicated that Lonnetta had been treated for drug addiction, alcoholism, and mental illness. Lonnetta's suicide assessment form for the same booking indicated that Lonnetta was taking Seroquel and Lorazepam. The form also indicated that Lonnetta had been in special education previously, had been depressed, and would hear noises or voices that other people do not seem to hear. The form also indicated that Lonnetta had thoughts of killing herself in the prior year, and that she was thinking of killing herself that day. The jail screening officer indicated that Lonnetta's speech was child-like.

25.     A July 5, 2018 Community Healthcore Crisis Reassessment form indicated that Lonnetta was placed on the Rusk State Hospital wait list over two weeks before due to psychosis. She had been released from jail two days before and taken to the emergency room for her acute mania/psychosis that day. She was acutely manic and psychotic, "speaking word salad, yelling, banging on things, and eloping from ER repeatedly in spite of multiple PRN medications for agitation." Lonnetta was apparently once again arrested and taken to, upon information and belief, the Harrison County jail. The treatment recommendation was that Lonnetta be hospitalized at Rusk State Hospital. Undoubtedly, all relevant County employees knew that Lonnetta had no chance of becoming competent. Regardless, the County continued to incarcerate Lonnetta over time.

26.     A September 17, 2019 jail medical intake form indicated that Lonnetta took several medications for mental illness and high blood pressure. The suicide assessment form confirmed that Lonnetta was taking medications including Quetiapine and Trazodone. The suicide assessment form confirmed what was clearly known to the County and potentially SHP, that being Lonnetta's history of mental illness. The Screening Form for Suicide and Medical/Mental/Developmental

Impairments for the same jail booking indicated that Lonnetta had received services for mental health issues in Sherman either two weeks before or for a period of two weeks. The form also indicated that Lonnetta had been in a hospital for emotional or mental health issues, including bipolar disorder, in the prior year. As with other such intake documents, as indicated above, a notification was made to a number of Harrison County employees, including but not limited to Chad Sims, Mike Smith, Clarice Watkins, and Nancy George.

27.    A suicide assessment form for a booking of Lonnetta on March 30, 2021, indicated that Lonnetta was taking Hydroxyzine and Metformin. The form indicated that Lonnetta had attempted to commit suicide the last time she was in jail. A Community Healthcore Crisis Assessment form for the same date indicated that Lonnetta was assessed pursuant to the jail's request, because Lonnetta was demonstrating symptoms of psychosis. Lonnetta went to a hospital early that morning asking to be transferred to a psychiatric hospital. She said that she had auditory hallucinations. While in the emergency room, Lonnetta became irritated and verbally abusive. Police were called, and instead of Lonnetta being taken to the nearest inpatient mental health facility, she was taken to the Harrison County jail. Lonnetta was punished, once again, by being jailed for attempting to seek help with her ongoing serious mental health issues.  Treatment recommendations included that Lonnetta be taken to Glen Oaks Hospital for stabilization due to symptoms of psychosis and homicidal ideation. Lonnetta needed intensive inpatient psychiatric help.

28.    A December 29, 2021 Screening Form for Suicide and Medical/Mental/Developmental Impairments for a booking of Lonnetta on that date, for her final incarceration, contained answers significantly different to those in similar forms previously completed in the Harrison County jail. The "yes" box was checked in response to the question, "Is

the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed." The provided comment read, "Asked several questions and she would not answer." Therefore, the form was substantially incomplete. Lonnetta was, according to the form, talking to herself in a way that the screening officer was unable to understand her speech. Moreover, the screening officer indicated that, due to mental illness, Lonnetta was talking to a non-existent person. That form was emailed to County agents and/or employees Patricia Binotti, Chad Sims, Clarice Watkins, Nancy George, Mike Smith, Charlene Graff, Dwight Mays, John Oswalt, Wayne Marcott, Ashley Morris, Amelia Jones, and Stephanie Self.

29.    A drug and alcohol questionnaire for the December 29, 2021 jail intake contained a handwritten note by Harrison County Jailer Schenck. Jailer Schenck indicated that he knew Lonnetta to be mentally ill due to her prior incarceration in the Harrison County jail. Jailer Schenck indicated that, while attempting to conduct the intake for Lonnetta for the second time, he saw that she was speaking to a non-existent person. He further wrote in part that he "believe[s] she is not in her right state of mind." A Continuity of Care Query for Lonnetta returned information indicating that Lonnetta had received mental health treatment through Sabine Valley Regional MHMR Center. Upon information and belief, it did business under the name "Community Healthcore." An undated application for health care assistance, but which was upon information and belief for the booking for the incarceration concluding in Lonnetta's death, appears to have been signed by Lonnetta. Lonnetta was again seeking help. She was not seeking to be incarcerated in the Harrison County Jail.

C.    Lonnetta's Suffering and Death Resulting from Incarceration in the Harrison County Jail

30.    Lonnetta suffered a tragic, completely unnecessary death on or about January 13, 2022 as a result of being incarcerated in the County jail. Defendants' policies, practices, and/or customs caused, were proximate causes of, were producing causes, and were moving forces behind Lonnetta's suffering and death and all other damages referenced in this complaint.  This section of the complaint provides only some material facts related to Lonnetta's suffering and death. Plaintiffs set forth other material facts related to Lonnetta's suffering and death in other portions of this complaint.

1.    Texas Rangers Investigation

31.    The Texas Rangers investigated the decedent's death.  The purpose of a Texas Rangers investigation regarding a custodial death, such as the decedent's, is to determine whether there was any criminal responsibility for what occurred.  Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case.  Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendants are liable for the decedent's death.

32.    Texas Department of Public Safety Texas Ranger Joshua Jenkins, with the oversight of level-one supervisor, Nicholas Castle, and level-two supervisor, William Kasper, conducted an investigation of Lonnetta's death. Sheriff B.J. Fletcher requested Texas Ranger assistance with the investigation. However, the County did not have a choice in the matter. Texas law required that the County have Lonnetta's death investigated by an outside agency.

33.    Ranger Jenkins went to Christus Good Shepherd Medical Center in Marshall after Lonnetta's death. He saw what appeared to him to be a rash on Lanetta's stomach and buttocks, and he took photographs of Lonnetta's body. Harrison County Justice of the Peace Clarice Watkins

had pronounced Lonnetta deceased before Ranger Jenkins' arrival at the hospital. Ranger Jenkins met with family members, including Lawanda Brooks, inside a waiting room at the hospital. Ms. Brooks is Lonnetta's sister. Ranger Jenkins indicated in his statement that Ms. Brooks expressed to him her concern about Lonnetta not receiving a bond the entire time she was confined at the Harrison County jail. Ms. Brooks, who is also a nurse, said that when Lonnetta had arrived at the hospital, her temperature and heart rate were dangerously low.

34.    Ranger Jenkins also went to the Harrison County jail, on January 14th, 2022, in connection with his investigation of any criminal aspects of Lonnetta's death. Sheriff Fletcher told Ranger Jenkins that Lonnetta's cell had been cleaned after she was transported to the hospital. Thus, the County disposed of significant material evidence which Ranger Jenkins could have reviewed.

35.    Ranger Jenkins learned that Lonnetta was being housed in "Separation A," which was a cell designed to hold one person. He also learned that Lonnetta was on 15-minute observation checks. Ranger Jenkins found that there were no cameras mounted inside Lonnetta's cell, but instead only one or more cameras monitoring the hallway outside of her cell. Ranger Jenkins learned that there are two separate ways to conduct visual checks on Lonnetta without opening the cell door. One is to look through a window on the cell door, and the other is to look through a window located on another side of the cell. The window on the other side of the cell, which happens to be the north side, has blinds which can be closed from the outside.

36.    Sheriff Fletcher told Ranger Jenkins that Lonnetta had been clothed with a suicide smock. Lonnetta had not even been supplied with a mattress, but instead just a blanket. Sheriff Fletcher said that Lonnetta, "had been placed on suicide watch due to her mental health." Sheriff Fletcher also told Ranger Jenkins that such was the reason that she was being monitored every 15

minutes, and for her being clothed in a smock and not having access to a mattress. Upon information belief, this situation had been continuous over two weeks, and no reasonable attempts had been made to transfer Lonnetta to an appropriate inpatient mental health facility and/or hospital.

37.     Ranger Jenkins reviewed only a small portion of relevant video recordings related to Lonnetta's incarceration and death. He noted when reviewing recordings for January 13, 2022, at 8:41 PM, according to the recording timestamp, Jailer Tennisha could be seen doing a check at Lonnetta's cell door. Only video, and no audio, was available. Ranger Jenkins then saw Jailer Stoker and Sergeant Haley Reed enter Lonnetta's cell at approximately 8:45:37 PM. Ranger Jenkins recorded a few other occurrences over the next few minutes related to recognition that Lonetta was beyond help at that point.

38.     It appears that Ranger Jenkins chose not to review video recordings in the days leading up to Lonnetta's death. This would have been vitally important in any criminal or civil investigation. Instead, Ranger Jenkins references video recordings made after Lonnetta was found. This provided little, if any, information regarding knowledge of what were likely a significant number of Defendant(s)' employees and/or agents, all acting or failing to act in the same manner, for at least several days, and possibly two weeks, before Lonnetta's death.

39.     Ranger Jenkins indicated in his report that he reviewed seven separate witness statements completed by Harrison County Sheriff's Office jail staff. Unfortunately, as with Ranger Jenkins' investigation, such statements did not address the days leading up to Lonnetta being found in a state after which she would be unable to be revived. These statements were produced by Harrison County Sherrif's Office ("HCSO") and Sergeant Janna Vanwert. Sergeant Vanwert was the first shift jail supervisor for January 13, 2022. Ranger Jenkins also read Sergeant Haley's and

Alexander Reed's witness statements. Sergeant Reed was the supervisor for the second shift, which was the shift beginning the evening of January 13, 2022 and concluding in the morning of January 14, 2022.

40.     Sergeant Reed identified her shift staff as Christian Chavez, Tennisha Stoker, Destinee Foust, and Alex Watson. Their assigned shift began at 7:00 PM on January 13, 2022 and ended at 7:00 AM on January 14, 2022. Sergeant Reed admitted that the day before (January 13, 2022), Lonnetta was dizzy, had muscle weakness, and fell when attempting to retrieve her breakfast tray early in the morning. Sergeant Reed also indicated that she saw Lonnetta sitting on the floor in a hunched over position, with fluid on the floor she believed to be Lonnetta's urine. She also indicated that first shift staff told Sergeant Reed that Lonnetta was seated in the same position for hours.

41.     Sergeant Reed said that she and Jailer Stoker agreed that Lonnetta's "zoned out behavior was uncommon for her." Regardless, neither obtained needed emergency medical treatment. Sergeant Reed also indicated, as referenced elsewhere in this pleading, that she called HCSO nurse, Wayne Marcott, to find out if he thought that they should take Lonnetta to the hospital. Sergeant Reed also said that she attempted to take Lonnetta's vitals but was unable to do so due to Lonnetta not being able to support herself in an upright position. It is Plaintiffs' understanding that one or more Harrison County officials told the TCJS that Harrison County objected to production of such records sought pursuant to the Public Information Act.

42.     Ranger Jenkins also read Jailer Tanisha Quentoya Stoker's witness statement. Jailer Stoker said that she arrived at the jail for her shift at 7:00 PM on January 13, 2022. She said that she and Sergeant Reed saw Lonnetta sitting slouched, in her cell, in her own urine. She also said that Sergeant Vanwert and Jailer Taylor Kaye Jones said that Lonnetta had been in that position

for hours. Ranger Jenkins had the opinion that Jailer Stoker's witness statement was consistent with the witness statement of Sergeant Reed. Ranger Jenkins also read Jailer Alex Clifton Watson's witness statement. Jailer Watson said that he retrieved the blood pressure machine for Sergeant Reed and Jailer Stoker. Jailer Watson said that he was told to relieve Jailer Foust in the control room, because Jailer Foust would need to ride with Lonnetta to the hospital.

43.    Ranger Jenkins also read Jailer Destinee Faye Foust's witness statement. Jailer Foust indicated that she was assigned to the control room at the jail from 7:00 PM until 9:03 PM on January 13, 2021. She indicated that she opened Lonnetta's cell door for Sergeant Reed and Jailer Stoker at 8:40 PM. After she was relieved from the control room, she walked to Lonnetta's cell and saw Lonnetta laying on her back on the cell floor. Jailer Foust traveled in the ambulance with Lonnetta to Christus Good Shepherd Hospital in Marshall, leaving the jail at 9:10 PM. She noted that Lonnetta's heart rate would go from 18 beats per minute to 37 beats per minute.

44.    She also indicated that they arrived at the hospital at 9:20 PM. Jailer Foust indicated that nurses attempted to obtain Lonnetta's temperature reading but was unaware if they were able to do so. She also indicated that, at 9:43 PM, a nurse brought in multiple blankets to warm Lonnetta. She further indicated that Lonnetta's heart rate dropped to zero at 9:45 PM. Jailer Foust also saw Lonnetta's sister, Lawanda Woolridge-Brooks, arrive in the room and watch nurses work on Lonnetta. She further indicated that Ms. Woolridge-Brooks is an employee of Christus Good Shepherd Hospital in Marshall. Jailer Foust was transported back to the jail at 11:45 PM.

45.    Ranger Jenkins also read Jailer Christian Blake Chavez's witness statement. Jailer Chavez said that, on January 13, 2022, at 7:00 AM, Sergeant Reed asked Sergeant Vanwert to keep a close watch on Lonnetta. This was due to Lonnetta not acting in a "normal" manner. Jailer Chavez also said that when his shift returned at 7:00 PM, they were told that Lonnetta had been

sitting in the same position for five hours. Moreover, there was nothing indicating that anyone sought any medical treatment - at all - for Lonnetta during that time. This was true despite the fact that a number of employees had knowledge of Lonnetta's situation, and all acted or failed to act in a similar manner. Ranger Jenkins indicated that the remainder of Jailer Chavez's statement was consistent with other witness statements concerning times and actions of Lonnetta and jail staff.

46.     Ranger Jenkins also read HCSO Jail Captain John Wesley Hain's witness statement. Captain Hain is the Harrison County Sheriff's Office jail administrator and supervises jail staff referenced in Ranger Jenkins' report. Captain Hain said that Lonnetta had been in and out of the custody of the Harrison County jail since May 2011. He further indicated that Lonnetta had been incarcerated a total of 15 times over that roughly 11-year period. He said that Lonnetta was known by jail staff to suffer mental illness, and when off her medications, she would routinely remain nude and attempt to show her genitals to jail staff. He further indicated that Lonnetta had arrived at the jail, at the beginning of her final incarceration, unclothed with no personal belongings.

47.     He also said that Lonnetta was immediately placed into a separation cell and put on suicide watch due to knowledge of her prior tendencies. Captain Hain further said that, on January 2, 2022, Community Healthcore conducted a mental health screening of Lonnetta. They diagnosed Lonnetta as having psychosis with homicidal ideations. The psychosis was nothing new, and it was well-known to the County, and upon information and belief also to SHP.

48.     Ranger Jenkins conducted an audio and video recorded interview of HCSO jailer Tennisha Stoker. Jailer Stoker indicated that she arrived for work at 7:00 PM on January 13, 2021. She said that Lonnetta would usually make noise but was quiet that day. She went by her cell and checked on her and found that Lonnetta was sitting in her cell with her legs spread apart, with her head looking down between her legs. Lonnetta was swaying back and forth. Jailer Stoker said that

Sergeant Haley Alexander Reed came to the cell window and also saw Lonnetta. Jailer Stoker said that Sergeant Janna Vanwert and Jailer Taylor Kaye Jones said that Lonnetta had been sitting like that for a couple hours.

49.    Jailer Stoker noticed at, around 11:40 PM, Lonnetta was still sitting in the same position. Plaintiffs provide in this complaint alleged times provided by specific people, including Jailer Stoker. However, even a cursory examination of times including in this pleading indicates that one or more people were mistaken as to times of relevant events. Plaintiffs do not stipulate that any time in this pleading is correct, and Plaintiffs will only be able to determine after discovery the correct timing of relevant material events.

50.    Jailer Stoker said that she and Sergeant Reed decided to go into the cell to check on Lonnetta. Jailer Stoker said that Lonnetta would not move from the above-referenced position and would not respond to her name other than a faint "huh" response. Jailer Stoker said that Lonnetta could not stand up on her own or support her own weight. She further said that Lonnetta's skin was cold to the touch. Jailer Stoker further said that Lonnetta was not looking at anything, but instead kind of looking around the cell and/or moving her eyes around. After someone received a blood pressure cuff, they were unable to obtain a reading. Jailer Stoker said that it was cold in Lonnetta's cell, and she had the opinion that it was close to 60 degrees. Upon information and belief, this contributed to Lonnetta's suffering and death.

51.    Jailer Stoker also said that she got a little movement from Lonnetta by administering an ammonia inhalant. She received no response to a sternum rub. Jailer Stoker said that, around 11:50 PM, Sergeant Reed called the on-call nurse. The on-call nurse said to call emergency medical services for Lonnetta.

52.     Jailer Stoker said that she also learned during briefing that Lonnetta had refused to eat and drink throughout the day. Upon information and belief, this would have been briefing just before the beginning of her 7:00 PM shift. She also said that Lonnetta was putting items into her cell toilet, including her suicide smock. Jailer Stoker said that Lonnetta was nude when she arrived for her shift, and that it was "normal" behavior for Lonnetta to walk around her cell naked. Jailer Stoker said that Lonnetta's suicide smock was laying on her bed, and her blanket was laying in one corner of the cell. Jailer Stoker said that Lonnetta's blanket was saturated with Lonnetta's urine. Upon information and belief, the blanket was in fact more of a stiff type of material, than a comfortable blanket, and which is used with detainees who may exhibit self-harm tendencies.

53.     Jailer Stoker said that Lonnetta would sit on the floor and urinate on herself, and that she would eat her own feces. Jailer Stoker said that Lonnetta would also defecate on herself, her blanket, and her smock. Despite such conduct, Harrison County and/or SHP continued over years, concluding with Lonnetta's final roughly two-week incarceration, to incarcerate a severely mentally ill person as opposed to having such a person, and specifically Lonnetta in this case, transferred to an appropriate in-patient mental health facility.

54.     Jailer Stoker said that Sergeant Reed had jail trustees clean up Lonnetta's cell after she was transported to the hospital on January 13, 2021. Jailer Stoker said that there was urine on the floor of Lonnetta's cell, and Jailer Stoker could not recall the last time Lonnetta's cell was cleaned. Jailer Stoker said that the trustees who cleaned the cell were Jimmy Jenkins, III, a black male, and Kevin Noyola, a white male.

55.     Ranger Jenkins also conducted an audio/video recorded interview of HCSO Jailer Christian Chavez. Jailer Chavez confirmed that he was working on January 13, 2022 at the jail,

with his shift starting at 7:00 PM. Jailer Chavez said that Sergeant Janna Vanwert told them during shift briefing that Lonnetta had been sitting on the floor for about five hours.

56.     Jailer Chavez said that he was assigned to the control room for four hours and thus had no interaction with Lonnetta until emergency medical services personnel arrived. He said that he assisted EMS in picking up Lonnetta and putting her onto the stretcher. He said that Jailer Destinee Faye Foust rode in the ambulance with Lonnetta to the hospital. Jailer Chavez also said that Lonnetta would never wear any clothes in her cell, and that she would not wear the provided suicide smock. Jailer Chavez said that they had to keep blinds to the cell closed, because male inmates would walk by the cell. Jailer Chavez also said that Lonnetta was laying in the middle of her cell floor "at the end," looking around, arms and legs spread apart. Jailer Chavez said that Lonnetta felt cold to the touch, and in his opinion, the cell temperature was around 70 to 72 degrees. He also said that Lonnetta's cell smelled like urine, and that she would defecate in her tray and give the tray to jailers. He said that Lonnetta would put items inside of her toilet.

57.     Ranger Jenkins completed his investigation and provided his investigative file to the Harrison County District Attorney's office for review. He learned that a Harrison County grand jury no-billed anything related to Lonnetta's death and thus determined that no one would be charged criminally for her death. However, as indicated above, such a determination had nothing to do with whether there was civil liability for Lonnetta's death.

58.     The Ranger's report listed a number of prescription medications for Lonnetta during her final incarceration in the Harrison County jail. Upon information and belief, Defendants knew the purpose and use of each such medication, as well as the seriousness of Lonnetta's mental health issues when considering the medications combined.

59.     Benztropine was one such medication. Benztropine is usually prescribed to treat symptoms of Parkinson's disease, a nervous system disorder that causes difficulty with movement, muscle control, and imbalance. It is also prescribed to treat tremors caused by other medical problems or medications. Lonnetta was also prescribed Clonidine. Clonidine can be used alone or in conjunction with other medications to treat high blood pressure.

60.     Lonnetta was also prescribed divalproex sodium. Divalproex sodium is used to treat certain types of seizures. It is also used to treat the manic phase of bipolar disorder and helps prevent migraine headaches. Lonnetta was also prescribed Invega. Invega is used alone to treat schizoaffective disorder, or in conjunction with other medications to assist with mood stabilizers and/or antidepressant therapy. Lonnetta was also prescribed lithium carbonate. Lithium is a mood-stabilizing agent indicated as a single therapy for treatment of bipolar 1 disorder. It is used to treat acute manic and mixed episodes in patients seven years and older, as well as used as a maintenance treatment. Quetiapine is a related or similar drug, as is Seroquel.

61.     Lonnetta was also prescribed Paliperidone. Paliperidone is used to treat symptoms of schizophrenia. Schizophrenia is a mental illness that causes disturbed or unusual thinking, loss of interest in life, and inappropriate or strong emotions. Paliperidone is in a class of medications referred to as atypical antipsychotics. It works by changing the activity of certain natural substances in the brain. Lonnetta was also prescribed Trazodone. Trazodone is used to treat depression, and it is in a class of medications referred to as serotonin modulators. It works by increasing the amount of serotonin in a person's brain and thus attempts to assist in attaining mental balance.

2.     Texas Commission on Jail Standards Investigation

62.     The TCJS conducted an investigation of the decedent's death.  The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing bare minimum jail standards. However, despite numerous Public Information Act requests, at the time this complaint was finalized, Plaintiffs were unable to obtain from TCJS documents and/or evidence related to that investigation. It is Plaintiffs' understanding that Harrison County told TCJS that it objected to TCJS releasing records pursuant to the Public Information Act. Thus, Plaintiffs will need to conduct discovery to obtain evidence which Harrison County attempted to keep from Plaintiffs' counsel.

        3.      Custodial Death Report (Filed with Attorney General)

63.     The Harrison County Sheriff's Department filed a custodial death report with the Attorney General of Texas. The report was completed by jail administrator Captain John Hain. The report indicated that Lonnetta was 41 years old at the time of her death, was originally in custody at 8:41 PM on December 30, 2021, and passed away on January 13, 2022 at 10:10 PM. The report further indicated that the most serious offenses for which Lonnetta was arrested were indecent exposure and criminal mischief. The report admitted that Lonnetta did not display or use a weapon, attempt to injure others, barricade herself or initiate a stand-off, physically attempt to or actually assault police officers, verbally threaten others including law enforcement officers, attempt to gain possession of a police officer's weapon, resist being handcuffed or arrested, gain possession of an officer's weapon, or escape or attempt to escape or flee custody. However, the report indicated, as was clearly beyond dispute, that Lonnetta exhibited mental health problems.

64.     The report further admitted that Harrison County was well-aware of Lonnetta and her mental illness due to prior incarcerations. It further admitted that Lonnetta would routinely be

nude while kept in a jail cell, and she would attempt to show her genitals to jail staff. This was another clear indicator of Lonnetta's serious mental illness.

65.     The report further indicated that Lonnetta's most recent arrest, before that concluding in her death, occurred on December 28, 2021. Lonnetta was kept in the Harrison County Jail until December 30, 2021, when she was released at 4:59 PM. The Marshall Police Department arrested her again on the same date, at 8:41 PM. She was then returned to the Harrison County Jail, undressed with no personal belongings. Instead of being transferred to the nearest in-patient mental health facility, the report indicates that Lonnetta was booked into the jail based on information received in prior jail bookings. Lonnetta was incarcerated in the Harrison County Sheriff's Office main jail, Separation Cell A, and was put on suicide watch. Community Healthcore performed a mental health screening, resulting in Lonnetta once again being diagnosed with psychosis. This was nothing new. This evaluation occurred on January 2, 2022. The custodial death report also admits, "The psychosis continued up to the day of her death on January 13, 2022." Regardless, upon information and belief, Defendants took no steps to have Lonnetta transferred to an appropriate in-patient mental health facility but instead allowed her to remain naked, on a cold cell floor, for hours, at times sitting in her own urine and/or feces, until she died.

66.     The report further indicates that Sergeant Haley Reed provided information about Lonnetta's final incarceration. While somewhat ambiguous, the report seems to indicate that Sergeant Reed told Sergeant Janna Vanwert that Lonnetta indicated she was dizzy and had muscle weakness and had fallen when attempting to take her breakfast meal tray early on the morning of January 13, 2022. When Sergeant Reed reported for duty again on January 13, 2022, at 7:00 PM, she asked Sergeant Vanwert how Lonnetta had been doing that day. Sergeant Vanwert said that Lonnetta had been quiet all day and had taken her medication without incident. Upon information

and belief, this may have been an understatement. Moreover, based upon other allegations in this complaint, the information communicated noticeably excluded other material information about Lonnetta, such as Lonnetta sitting, naked, on the cold floor, in the same position, for hours.

67.     Sergeant Reed then visually checked Lonnetta and saw her sitting in a hunched position with her legs spread facing her bunk. Sergeant Reed noted that such behavior was uncommon for Lonnetta. Sergeant Reed also saw urine on the cell floor. Sergeant Reed asked Jailer Stoker to also look at Lonnetta. Jailer Stoker and Sergeant Reed described Lonnetta as "zoned out," a behavior uncommon for Lonnetta. Regardless, Sergeant Reed and Jailer Stoker did not enter Lonnetta's cell until approximately 8:35 PM. They purportedly were going to speak to Lonnetta and try to get her off of the cold cell floor. When they reached for Lonnetta's shoulders to try to sit her upright, they noticed that her skin was cold. Amazingly, the report indicates that this "did not cause immediate concern as Ms. Johnson was sitting unclothed on a cold concrete floor and was incapable of supporting herself." This apparent lack of concern was indicative, upon information and belief, of a systemic disregard for medical and/or mental health issues in the jail.

68.     Lonnetta's eyes were open and wandering, and Lonnetta was breathing heavily and groaning. Neither a pneumonia inhalant nor a sternum rub obtained a response. Sergeant Reed then called Nurse Wayne Marcott and told him of the situation, and he said to take Lonnetta to the emergency room if Sergeant Reed was concerned. Plaintiffs are uncertain as to whether Nurse Marcott was a County employee or in the alternative an SHP employee. Plaintiffs need discovery to make this determination, as well as to obtain additional information regarding the interaction between County employees and SHP employees regarding medical and/or mental health care provided to detainees. Sergeant Reed then decided to call for EMS and have Lonnetta taken to the emergency department of a local hospital. The report further indicates that Marshall Fire

Department EMS arrived at the jail at approximately 9:03 PM and also saw Lonnetta sitting on the cold cell floor.

69.     According to the report, EMS left Lonnetta's cell at approximately 9:20 PM and arrived at the emergency department roughly two or so minutes later. Jailer Foust, who went with the EMS team to the hospital, told Sergeant Reed via text that Lonnetta's pulse had stopped at approximately 9:52 PM. This was roughly 30 minutes after Lonnetta had arrived at the emergency department of the hospital. Despite hospital staff's efforts to revive Lonnetta, she was pronounced deceased at approximately 10:10 PM.

70.     Sheriff Brandon J. Fletcher, of the Harrison County Sheriff's Office, authorized a press release regarding Lonnetta's death. The press release was dated January 14, 2022, and it indicated that the media point of contact at the Harrison County Sheriff's Office would be Captain Tyler Owen. The press release indicated that Lonnetta had been on 15-minute welfare checks at the jail. This was an admission that Lonnetta had serious issues, and which were likely well-known to a significant number of County jail employees and/or agents. Lonnetta had been incarcerated as of January 13, 2022 for approximately two weeks, and the fact that such 15-minute checks, which are significantly less than the 30-minute and/or 60-minute required minimum checks by the Texas Commission on Jail Standards, depending on the status of a detainee, were indicative of the County's knowledge of Lonnetta's serious medical and mental health issues. Regardless, checks alone, without intervention, are insufficient.

### 4.     Inmate Death Report (Filed with TCJS)

71.     Plaintiffs expect that the County filed an Inmate Death Report with the TCJS. However, after numerous attempts to obtain records pre-suit from the TCJS, Plaintiffs were

unsuccessful. It is Plaintiffs' understanding that one or more Harrison County officials told the TCJS that Harrison County objected to production of such records sought pursuant to the Public Information Act. Therefore, after discovery, Plaintiffs may seek to re-plead to add additional allegations which will likely become apparent after review of records obtained through the discovery process.

5.    Medical Records

a.    EMS Records

72.    Marshall Fire Department EMS records indicate that EMS personnel found Lonnetta lying face-up in a jail cell, naked, in her own urine, and not responding to verbal commands. Lonnetta would only respond minimally to painful stimuli. Lonnetta had tremors during EMS care, and there were multiple wounds to her lower abdominal and inner thigh area due to, according to jailers, Lonnetta scratching herself. This self-injury was in fact a further indicator, upon information and belief, of Lonnetta's known, ongoing serious mental health issues.

73.    Lonnetta's eyes were non-reactive to light, and she "felt very cool to the touch." EMS personnel covered Lonnetta due to "possible hypothermia." Lonnetta's glucose reading was high, and she was bradycardic. Lonnetta remained unresponsive during transport to a local hospital, Christus Good Shepherd Medical Center in Marshall. Lonnetta's pulse was only 37, and her Glasgow Coma Scale (GCS) score was only 10 (as compared to a normal score of 15). The GCS is used to objectively describe the extent of impaired consciousness of an acute medical or trauma patient, and it assesses three responsiveness aspects: eye-opening, motor, and verbal responses.

74.    One provider, EMT Olivia Greer, provided a written statement. She indicated that, on January 13, 2022, she heard a Harrison County jailer/deputy say, "She [Lonnetta] has been

going in and out for a couple of days." Upon information and belief, EMT Greer heard this comment while she and/or others were caring for Lonnetta. Upon information and belief, this indicated that Lonnetta had clear, visible symptoms of a serious medical condition for at least a couple of days, and potentially more. There was thus a systemic failure to act by Defendant(s) consistent with, upon information and belief, Defendant(s)' policies, practices, and/or customs.

<u>b.      Hospital Records</u>

75.     Christus Good Shepherd Medical Center records regarding Lonnetta's hospital treatment indicate in part the serious condition in which Lonnetta had remained at the jail while no one took any action to save her life. Lonnetta's body temperature was only 90.1 degrees. Moreover, Lonnetta's skin was "very, very cold to touch." Lonnetta's GCS was still only 10. A 10:16 PM note by Faber A. White, MD indicated that Lonnetta arrived at the E.D. "essentially unresponsive and markedly bradycardic." Bradycardia is a slow heart rate. Further, warming orders had to be initiated due to Lonnetta's cold temperature. The note further read in part, "It is uncertain why patient was so cold on arrival to the department. Approximately 10 to 15 minutes after arriving in the ED, patient's heart rate decreased to zero and a CODE BLUE was called." Medical staff administered several unsuccessful, rounds of medication, attempting to save Lonnetta's life. An ultrasound confirmed a complete lack of cardiac activity. Lonnetta exhibited no spontaneous respirations or response to treatment "despite 30 minutes of aggressive resuscitative efforts." Medical providers' efforts ceased at 10:10 PM.

76.     The physician further wrote in part "There is no question that her hypothermia was a large contributing factor to her arrhythmia and ultimate outcome; unfortunately, patient had no meaningful cardiac activity for approximately 30 minutes or more, eliminating the possibility for meaningful neurologic outcome." There were other significant medical determinations made at the

hospital, all of which indicating, when considered in the light most favorable to Plaintiffs, that Lonnetta had been seriously neglected in the jail for a significant period of time.

c.    Autopsy Reports

77.    Forensic pathologist Christopher P. Geffre, M.D., PhD of Forensic Medical of Texas, P.A., in Tyler, Texas, conducted an autopsy of Lonnetta. Dr. Geffre listed in his report Lonnetta's cause of death as being cardiac arrhythmia due to hypertensive and atherosclerotic cardiovascular disease. He indicated that the manner of death was natural, and that a contributing factor was Lonnetta's diabetes. Plaintiffs do not necessarily agree with either the manner or cause of death listed in that report, but are instead providing such information in this pleading for completeness. Plaintiffs have alleged a manner and cause of death separate from that indicated in the two autopsy reports described in this pleading, and Plaintiffs currently believe the alternative cause and manner of death provided by Plaintiffs to be accurate. Regardless, Plaintiffs believe additional discovery may be necessary to determine the actual cause of death and how Defendants' policies, practices, and/or customs interacted with signs and symptoms of Lonnetta's suffering and impending death.

78.    American Forensics, in Mesquite, Texas also conducted an autopsy of Lonnetta. This followed the autopsy of Lonnetta conducted at Forensic Medical of Texas, P.A. Forensic pathologist David K. Arboe, II, MD conducted the autopsy for American Forensics. The autopsy report indicated Lonnetta's cause of death as hypertensive cardiovascular disease, and that Lonnetta had other significant conditions including diabetes mellitus, morbid obesity, and schizophrenia. Dr. Arboe listed the manner of death as "natural." However, once again, as indicated elsewhere in this pleading, Plaintiffs do not necessarily agree as to either the manner or cause of death in this autopsy report but will rely on evidence as it is obtained through the case,

and further expert opinions and/or testimony to determine and/or better inform the actual cause and manner of death and how Defendants' policies, practices, and customs relate to the manner and cause of Lonnetta's death.

79.    One reasonable alternative cause of death to that listed in any autopsy reports, and that which Plaintiffs currently contend is the most likely cause of death, is that Lonnetta died of being in a hyperosmolar nonketotic state. In other words, Lonnetta likely died of diabetic hyperosmolar syndrome. Upon information and belief, if such was Lonnetta's cause of death, there would have been visible symptoms for several days prior to her death.

80.    Further, as elsewhere indicated in this pleading, Lonnetta had a severely altered mental status. Such an altered mental status would not allow her brain to prompt her to get up off of the cold cell floor and take action to save her own life. Thus, it was incumbent upon the Defendants to take appropriate action. The Defendants failed to do so even though they knew, upon information and belief, that diabetic hyperosmolar syndrome has a higher mortality rate than even diabetic ketoacidosis ("DKA"). All competent county jail and jail policymakers, and private corrections healthcare provision companies, are fully aware of DKA and likewise, due to the higher mortality rate of diabetic hyperosmolar syndrome, would likely be aware of such a malady and the importance of having in place appropriate policies, practices and/or customs to treat a person with such a medical issue (or to avoid the issue arising at all).

D.    Liability of Harrison County and Southern Health Partners

1.    Introduction

81.    Plaintiffs set forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436

U.S. 658 (1978).  It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County and/or SHP support such *Monell* liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, and whether supporting episodic acts and omission and/or conditions of confinement claims, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein.  These policies, practices, and/or customs are pled individually and alternatively.  The County and/or SHP knew, when the County incarcerated the decedent, that their personnel, policies, practices, and/or customs were such that they could not meet its constitutional obligations to provide medical and mental health treatment to, and protect, the decedent.  The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail. SHP likewise made decisions about policy and practice which it implemented through appropriate employees, decisionmakers, and/or policymakers. The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege at the pleading stage the identity of chief policymakers.

82.     There were several policies, practices, and/or customs of the County and/or SHP which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading.  The County and/or SHP made deliberate decisions, acting in a deliberately indifferent (potentially applied only to any episodic act claims but not to alleged conditions of confinement claims) and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County and/or SHP  implemented and/or consciously allowed

such policies, practices, and/or customs to exist, they knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.    Southern Health Partners' Agreement and Partnership with Harrison County to Provide Medical and Mental Health Care Services to Harrison County Detainees

83.    The business of providing, or in some situations unfortunately not providing, health care and mental health care to prisoners in county jails throughout the United States is big business. There are untold millions of dollars to be made by private companies, such as Southern Health Partners, promising and/or contracting to provide such services.  Southern Health Partners is no exception to the rule that such companies are in business to make significant profits.

84.    During Lonnetta's final incarceration, concluding in her death at the Harrison County jail, Harrison County had a contract with SHP. The relevant contract for that time period commenced August 16, 2021 and concluded August 15, 2022. Upon information and belief, there may have been one or more similar contracts in place for years before, and possibly after, that relevant contract. The contract provided for renewals.

85.    Harrison County contracted with SHP to provide for the delivery of medical, basic dental, and basic mental health services to detainees in the Harrison County jail. This care would be delivered to detainees under the custody and control of Harrison County at the jail. Basic mental health services referenced in the contract meant the "starting point of mental health services whereby SHP medical staff [would] continue, to the extent practicable, any prior mental health treatment plan a [then]-incarcerated patient had in place, or, upon identification of a mental health service need, may have an on-site provider(s) prescribe a low-level mental health medication until patient can be scheduled and seen by an outside mental health professional, if needed."

86.     In addition, and inclusive of certain medical staffing services that SHP would provide, SHP had to provide an on-site staffing plan of 164 nursing hours per week, which would include a regular schedule of 12 hours per day, 7 days per week at the jail, and a regular schedule of 8 hours per weekday, at the Annex. Thus, upon information and belief, SHP had staff on duty at the jail at which Lonnetta was incarcerated every day of her final incarceration in that jail.  SHP also had to provide a qualified mental health professional, which would be either a psychiatric RN, social worker, or licensed professional counselor, either on-site or via tele-psychiatry for up to eight regularly scheduled hours per week.

87.     SHP's responsibility for care of a detainee started no earlier than booking of the detainee into the jail, and physical placement of the detainee into the jail and notification to a member of SHP medical staff of same. SHP had to provide and/or arrange for professional services including medical and mental health and related healthcare services for detainees, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, pharmacy services management, administrative support services, and other related services.

88.     The contract further read, ". . . None of the services to be provided by SHP as described herein shall alter or eliminate the duty and ability of the county, through its employees, to arrange for emergency medical care at any time." While this was an inartfully stated portion of the County's constitutional duties, it was a tacit recognition by the County that it owed to jail detainees, including Lonnetta, non-delegable duties of protection, to provide reasonable medical care, to provide reasonable mental health care, and not to punish pre-trial detainees.

89.     SHP was financially incentivized, in order to continue its relationship with the County, to not have people such as Lonnetta transported to a local hospital. The contract provided

that the County had to shoulder costs associated with providing certain medical care, which included major chronic care procedures, clinical lab procedures both inside and outside the jail, and x-ray procedures inside and outside the jail.

90.    As to emergency services, when on-site, SHP staff had to provide on-site emergency medical care to detainees, or in the alternative, arrange for emergency ambulance transportation of detainees for off-site care. The cost of such emergency ambulance transportation would either be billed directly to the County by the provider or placed in the annual cost pool, at the County's election. Further, the contract provided that "in no event shall jail staff be required to contact SHP medical staff prior to initiating life-saving measures, contacting the local 911 service or other third-party calling programs, or otherwise seeking the highest priority emergency medical attention, as reasonable and appropriate, for any inmate jail staff believes to be in need of immediate medical care."

91.    The contract further provided that a detainee shall not be accepted into the jail by the County without first being "medically cleared" for booking and commitment. That provision mentions nothing about being cleared for mental health reasons, thus further solidifying the purported focus on medical issues as opposed to mental health issues.

92.    SHP was also responsible, pursuant to the contract, to keep medical records for detainees, beginning with the effective date of the agreement and, upon information and belief, potentially for prior agreements. SHP was charged with the obligation to maintain a complete and accurate medical record for each detainee who received healthcare services. This medical record was to be kept separate from each detainee's confinement record, and each such record moreover was available, at all times, to the County as custodian of the person.

93.     Further, the contract provided that the County would compensate SHP, based upon a 12-month annualized price of $472,440.00 during the initial term of the agreement, payable in monthly installments. This base price was calculated on an average daily inmate population of up to 250 people. If the population exceeded 250 detainees for any given month, compensation payable by the County to SHP would be increased by a per diem rate of $1.25 for each inmate over 250. The per diem amount was intended to cover additional cost in instances where minor, short-term changes in inmate population resulted in a higher utilization of routine supplies and services. However, the per diem amount was not intended to provide for any additional fixed costs, such as new fixed staffing positions that would prove necessary if the detainee population grew significantly and/or if the growth were sustained. In such case, SHP could renegotiate amounts it would be paid. Obviously, nothing would require the County to agree to any such renegotiated amounts. Thus, SHP was incentivized to keep costs low, to maximize its profits. Further, annual base price and per diem rate referenced above would increase by 3% in each subsequent annual contract.

94.     The contract also required SHP to maintain professional liability insurance for work it conducted in and for the county jail, in the minimum of amount of $1,000,000 per occurrence and $5,000,000 in the aggregate. The contract also provided that if any lawsuit were filed against the County, "frivolous or otherwise," based upon any allegations concerning SHP's medical care of detainees and performance of SHP's employees, agents, subcontractors, or assignees, then SHP and its employees, agents, subcontractors, assignees, or independent contractors could be joined as parties defendant in any such lawsuit. In such a case, such person(s) shall be responsible for their own defense and any judgments rendered against them by a court. The agreement also contained indemnity provisions running from SHP to the County, and from the County to SHP.

The contract was signed by the county judge for Harrison County, and by Jennifer Halrsine, president and chief executive officer of SHP.

### 3.    Non-Delegable Constitutional Duties, Respondeat Superior, and Qualified Immunity Unavailability

95.    The County owed non-delegable constitutional duties to the decedent.  Therefore, the County is liable for the policies, practices, and/or customs of SHP, as well as the actions and/or inactions of SHP employees, which caused, were proximate causes of, and were producing causes of death and damages referenced in this pleading.

96.    Moreover, SHP, in addition to liability for its policies, practices, and/or customs resulting in damages and death referenced in this pleading, is also vicariously liable, pursuant to respondeat superior, for the actions and/or inactions of its employees and agents. Plaintiffs make this allegation pursuant to existing law and/or as a good faith argument for the extension or confirmation of existing law.  SHP, as a large, private, for-profit entity, does not receive the same protection and/or is not, in the alternative, analyzed the same way as a liable entity as would be a county or other governmental body.  Moreover, as to SHP employees and agents, due to SHP's status as a large, for-profit corporation, and controlling Fifth Circuit authority, they are not entitled to claim, in good faith, qualified immunity.  No such employees are Defendants in this case.

97.    Further, regarding SHP, upon information and belief:

- SHP was systematically organized to perform the major administrative task of providing medical and mental health care jails inside and outside Texas.

- SHP was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- SHP has made millions of dollars each year from its contracts with Texas and other jails, contracting as of the time of the incident, upon information and belief, with over 240 jails in 14 states.

- SHP advertises that its medical, dental, and mental health services are tailored to the needs of each jail, and that it improves not only the quality of care in jail but moreover cost savings, greatly reducing risk through "tight controls and by providing insurance liability coverage for [SHP's] program."

- SHP was at the time of decedent's death a systematically–organized entity with limited direct supervision by County, undertaking its task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide SHP with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or non-arduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times regarding SHP's provision of services to County.

- SHP had, upon information and belief, a multi-year contract with County with renewal periods, such that its performance was disciplined by pressure from potentially competing firms who could try to take its place in providing services to County.

- SHP was required by its contract to purchase insurance to compensate victims of civil rights torts, such insurance coverage being substantial.  SHP provided professional/medical malpractice liability coverage in an amount of not less than $1,000,000 per occurrence and $5,000,000 in the aggregate.

- SHP, upon information and belief, maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- SHP employed medical professionals who faced potential liability both for choosing a course of treatment that is too aggressive and for choosing a course not aggressive enough, rather than jailers, who rarely face liability for the adequacy of provided medical care.

- SHP's primary function at the jail was providing healthcare and mental healthcare services.

- SHP employees are overseen by SHP.

- SHP, as opposed to County, upon information and belief, took the lead in developing relevant policy regarding healthcare and mental health care provision in the County jail.

- SHP developed and maintained, upon information and belief, the County jail's healthcare policies and procedures manual.

- County could not, upon information and belief, fire or discipline SHP's employees.

- SHP employees had discretion to take certain actions which County employees lacked the authority to do.

- Upon information and belief, SHP employees did not have a broad range of duties other than providing healthcare and/or mental health care.

- SHP had substantial latitude to ensure that its employees are adequately motivated (such as through employer indemnification, increased benefits, and higher pay, each being used as a tool).

- SHP's employees are "at will" employees and could be discharged at any time without cause.

- SHP determined its employees' wages, conditions of employment, and availability of benefits.

- SHP marketed its ability, upon information and belief, to attract qualified people to public service as an aspect of its sales pitch to County and other governmental clients.

- SHP, and likely its employees, knew that they could be subject to liability without the benefit of qualified immunity; even so SHP was able to attract qualified employees.

- SHP contracted to indemnity County for liability caused by SHP or its agents, employees, or contractors.

### 4.    Harrison County and/or Southern Health Partners Policies, Practices, and Customs

98.    Plaintiffs list beneath this heading County and/or SHP policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death.  Thus, the County and/or SHP are liable for all such damages.  These policies, practices, and/or customs worked individually, and/or in the alternative

together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and/or customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In the alternative, Plaintiffs plead episodic act and/or omission claims arising from policies, practices, and/or customs. Plaintiffs plead, to the extent necessary, that deliberate indifference underlying episodic act and/or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiffs ask that the court apply the correct law to the facts pled, as required by Supreme Court precedent.

99.    One of more courts have recognized that it is exceedingly rare that a Plaintiff will have access to or personal knowledge of specific details regarding the existence or absence of defendants' internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity or private corporation on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act and/or omission claims, in this portion of the complaint upon information and belief:

- Harrison County and/or SHP failed to monitor or in the alternative had inadequate monitoring of detainees.

- Harrison County and/or SHP failed to reprimand and/or take remedial action against employees and/or agents as a result of action and/or inaction related to Lonnetta's suffering and death, thus confirming that the policies, practices, and/or customs which led to such suffering and death were in fact *de facto* policies of Harrison County and/or SHP.

- Harrison County and/or SHP, while knowing that detainees needed immediate in-patient mental health care, would incarcerate such individuals in lieu of obtaining such needed care.

- Harrison County and/or SHP, in the alternative, while monitoring detainees, failed to take action based upon material information obtained during such monitoring regarding serious physical and/or mental health issues. This was due in part, as may be true with other potential policies, practices, and/or customs, to attempt to save costs.

- Harrison County and/or SHP, akin to an unconstitutional "sleep it off" policy for intoxicated individuals, had a "serve your time" policy for serious mentally ill detainees. Thus, instead of having such detainees transferred to an appropriate in-patient mental health facility for needed treatment, Harrison County and/or SHP would continue to incarcerate or allow incarceration of such persons.

- Harrison County and/or SHP would take actions designed to save Harrison County and/or SHP money, by failing and/or refusing to send for needed in-patient mental health treatment, and/or to a local emergency room, detainees who vitally needed such care.

- Harrison County and/or SHP failed to provide and/or delayed providing medical and/or mental health treatment to detainees.

- Harrison County and/or SHP did not provide appropriate housing for a person with severe mental illness, such that the person, as a result of that illness, would insist on being completely unclothed in a very cold cell, with a concrete floor.

- Harrison County and/or SHP chose to have cell temperatures so low such that persons who, as a result of mental illness chose not to be clothed, would suffer needlessly.

- Harrison County and/or SHP allowed blankets and/or other cloth items to remain in cells of mentally ill people, such blankets and/or other items being soaked with urine and or soiled by feces.

- Harrison County and/or SHP allowed mentally ill detainees to remain on a cold cell floor, laying in their own urine and/or feces, for hours.

- Harrison County and/or SHP, rather than providing mental health treatment, simply obtained mental health evaluations of detainees without obtaining corresponding needed mental health treatment.

- Harrison County and/or SHP chose to have a purported qualified mental health professional on duty available at the jail for only up to eight regularly scheduled hours per week, and even then, potentially by remote means only.

- Harrison County and/or SHP chose, through their contractual negotiations, to focus on medical care at the expense of mental health care even though mental health care has become a vitally important part of triaging and caring for the jail population.

### 5.    TCJS Records Demonstrating County Practices and/or Customs

100.    TCJS reports and documents regarding inspections of the County's jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, producing causes of, and/or were moving forces behind damages (including death) asserted in this pleading.

101.    On July 28, 2010, the Texas Commission on jail Standards (TCJS) inspected the Harrison County jail. The TCJS determined that deficiencies existed, and it found that Harrison County was in administrative non-compliance with minimum jail standards. Harrison County was warned that failure to initiate and complete corrective measures following receipt of a notice of non-compliance could result in issuance of a remedial order. Harrison County was not observing inmates in holding and/or detox cells at intervals not to exceed 30 minutes. Moreover, Harrison County was not following its approved mental health plan. MHMR was not notified by Harrison County after inmate Jecori White was placed on a suicide watch. The TCJS also determined that Harrison County was not completing in its entirety the screening form regarding medical and mental health issues for all inmates immediately upon admission to the jail.

102.    The TCJS inspected the Harrison County jail again from January 11 through 12, 2016. The TCJS determined, when reviewing face-to-face check documentation of inmates on a 15-minute watch, that a jailer was using a sheet where the check times had already been typed into the form. Thus, jail records were presumably false. The TCJS required the County to begin using a sheet where "the real time of the check made will be written by the jailer."

103.    The TCJS inspected the Harrison County jail again on February 13 and 14, 2018. As a result, the TCJS once again determined that deficiencies existed. Harrison County was urged to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. Harrison County was warned that the failure to initiate and complete corrective measures could result in issuance of a remedial order.

104.    The TCJS inspector determined that the fire panel in the jail was not able to reset to normal mode after running a simulated fire drill. The panel showed a fault. Further, when walking through the annex facility, the inspector saw evidence of roof leaks in the kitchen, a detox cell, and dormitories. The inspector also saw that paint and showers had worn away and exposed bare concrete block. The inspector wrote, "The showers in the dorms are in severe need of paint."

105.    The TCJS inspected the jail again on March 4 and 5, 2019. Once again, the Harrison County jail failed the inspection. Harrison County was once again notified that deficiencies existed, and it was to give areas of non-compliance its immediate and serious consideration. Jail administration was unable to produce documentation showing that jail staff had received the required one-hour of suicide recognition/prevention training upon employment for new employees and one hour of annual training for existing employees.

106.    Further, when reviewing face-to-face observation of inmate records for those placed on a 15-minute suicide watch, jail staff exceeded the 15-minute minimum observation period by as little as one minute and by as many as 29 minutes. Further, when reviewing face-to-face observation records for inmates placed in restraints, Harrison County jail staff exceeded the 15-minute minimum observation period by as little as one minute and by as many as forty-two minutes.

107.    The inspector also noted significant ongoing facility maintenance problems. By way of example, the inspector noted that the roof was leaking again in the jail annex. Further, as to food handling, jail administration could not produce food handler licenses for all staff supervising food preparation. Finally, when reviewing disciplinary records, the inspection team determined that jail staff were not allowing inmates the full 24-hour notice before offering an inmate a waiver. In some cases, officers were serving the notice and having the inmate sign the waiver at the same time.

108.    As a result of another TCJS inspection occurring on December 2 and 3, 2019, the Harrison County jail was once again found to be non-compliant. The TCJS, once again, warned the Harrison County jail that deficiencies existed. Harrison County was failing to comply with minimum jail standards. The TCJS inspector determined when reviewing an inmate file that the inmate did not have documented care for his acute condition in accordance with the approved facility operational plan. The inmate had leukemia and allegedly had not received his medication. There were also alleged issues with the jail making appointments with appropriate medical providers. The TCJS required jail staff to develop a plan of action, within 30 days, to ensure that a qualified medical professional review as soon as possible any prescription medication an inmate was taking when the inmate is taken into custody. Further, Harrison County had to document training on this plan of action with all medical staff in the jail.

109.    The TCJS inspected the jail again from December 15 through 16, 2020. Once again, the Harrison County jail failed the inspection and was found to be non-compliant. Harrison County would thus, again, be listed in the short list at the TCJS website of non-compliant Texas jails. Harrison County was once again notified that it must address its deficiencies, in failing to comply with minimum jail standards, or a remedial order could issue.

110.    A TCJS inspector noted when reviewing classification records that classification reassessments were not conducted when inmates were placed in and/or released from special units, including protective custody, administrative separation, disciplinary separation, and mental and medical health housing. The inspector also found, when reviewing restraint logs, that jail staff exceeded the minimum 15-minute observation checks by as little as one minute and by as many as 22 minutes on multiple occasions.

111.    When reviewing inmate medical records, the TCJS inspector found that jail staff failed to properly document on the medication administration record when medications were dispensed to inmates. The inspector was unable to determine that detainees had received medications as prescribed by a physician. By way of example, the inspector found that detainee M. Lopez had his medication stopped after seven days, even though the medication was prescribed for ten days. Jail staff had to conduct training within 30 days regarding the use of restraints and develop a plan of action to ensure that medications were dispensed in accordance with physicians' orders.

112.    The inspector also found that inmate workers housed on the fourth floor were not observed by jailers no less than once every 60 minutes. In fact, jail staff told the inspector that they do not conduct observations of inmates on the fourth floor - at all. Thus, electronic cell check records confirmed that no documented face-to-face observations of fourth floor inmates were conducted for a period of time beginning November 1, 2020 and concluding December 15, 2020.

113.    Harrison County continued flaunting its obligations pursuant to TCJS minimum jail standards. An inspection occurred on March 23, 2021, and Harrison County once again was found to be non-compliant. It thus once again would be posted at the TCJS website in the short list of jails in Texas who were non-compliant.

114.    The TCJS inspector, when reviewing cell history logs, determined that on several occasions, Harrison County chose to exceed the capacity of specific cells. Further, the inspector found when reviewing cell history logs that on several occasions minimum and maximum custody level inmates were housed together. Harrison County was once again warned to initiate and complete corrective measures to avoid issuance of a remedial order.

115.    A special inspection report issued as a result of a June 7, 2021 inspection. Once again, as became a pattern, the Harrison County jail was found to be non-compliant and listed at the TCJS website as being in such status. Harrison County was urged to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. After reviewing written documentation from a March 1, 2021 custodial death, the TCJS inspector determined that the Screening Form for Suicide and Medical/Mental/Developmental Impairments was not completed in its entirety. It likewise was not documented to indicate the detainee's refusal or inability to complete the form. Further, when reviewing documentation regarding the March 1, 2021 custodial death, the TCJS inspector determined that the Continuity of Care Query was not run immediately upon intake, as detailed in Harrison County's approved mental disability/suicide prevention operational plan.

116.    The Harrison County jail was inspected once again from December 13 through 14, 2021. When reviewing inmate medical files, the inspector determined that jail staff were still not completing the Screening Form for Suicide and Medical/Mental/Developmental Impairments in its entirety. Areas not completed included magistrate notification, dates and times and comments for detainee, and detainee "yes" answers. Harrison County jail staff also failed to answer observation questions and failed to notify a magistrate within 12 hours of an exact CCQ return when a specific detainee was processed and refused to answer screening questions. TCJS required

that jail administration complete documented training with staff on completing the screening form in its entirety.

### 6.    Harrison County Jail - Suffering and Death of Other Detainees

117.    Other suffering and death in the Harrison Countty jail support *Monell* liability. Upon information and belief, Captain John Hain has been the Harrison County Sheriff's Department jail administrator for a number of years. He would typically report to the Attorney General of Texas any custodial deaths.

118.    On September 4th, 2007, Captain Hain reported the death of William Vaughn Phillips, Jr. Mr. Phillips purportedly passed away as a result of bleeding ulcers. The custodial death report indicates that Mr. Phillips was booked into the jail on August 20, 2007. It moreover indicates that Mr. Phillips began to have stomach issues on August 26, 2007. Mr. Phillips was found to be unresponsive, after receiving Pepto-Bismol, the following day. EMS personnel arrived at the jail and were unable to resuscitate Mr. Phillips. A justice of the peace pronounced Mr. Phillips deceased at the jail that same day.

119.    On October 23, 2007, Captain Hain completed a custodial death report regarding the death of Marc Douglas Still. Mr. Still purportedly died as a result of alcohol and or drug intoxication. Mr. Still had originally been incarcerated in the Harrison County jail on October 1, 2007, while awaiting transfer to the Johnson County jail. On October 2, 2007, Mr. Still was transported to the Marshall Regional Medical Center for severe delirium tremens related to detoxification from alcohol, as well as his elevated blood pressure. He was treated and released back to the Harrison County jail. Mr. Still was ultimately placed into a detoxification cell and put

on a 15-minute check. Mr Still was incoherent at times and was ultimately found unconscious. Marshall EMS was contacted, and Mr. Still was determined to be deceased upon EMS's arrival.

120.    Captain Hain reported another custodial death on March 25, 2009. Julius Eugene Malloy, III passed away as a result of suicide in the Harrison County jail. Mr. Malloy used a phone handset cord as a ligature.

121.    On April 17, 2017, Captain Hain filed a custodial death report regarding the death of Mary Ann Flanagan. Ms. Flanagan was incarcerated in Holding Cell B. Ms. Flanagan was seen using the telephone and looking out of the window of Holding Cell B. She was then seen to be sleeping for a period of time, after which she was found deceased. No lifesaving measures were initiated by jail staff, as Ms. Flanagan was already deceased. This seems to have been a common pattern regarding some custodial deaths in the jail, as by the time a person was found to need medical care, the person was deceased and beyond any help CPR could provide.

III.    Causes of Action

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

122.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement

among the Circuits.  *Id.* at 2471-72.  The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 2472.  Instead, "courts must use an objective standard."  *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable."  *Id.* at 2473.  Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard.  Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

123.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

124.    This *Kingsley* section potentially applies, depending on the current status of the law, only to any claims that ultimately might be asserted against natural persons, or any episodic act and/or omissions claims against Harrison County and/or SHP. Plaintiffs make no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to show conditions of confinement claims against Harrison County and/or SHP.

B.      Remedies for Violation of Constitutional Rights

125.    The United States Court of Appeals for the Fifth Circuit has held that using a state's

wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to

42 U.S.C. § 1983.  Therefore, Plaintiffs seek, for causes of action asserted in this complaint, all

remedies and damages available pursuant to Texas and federal law, including but not necessarily

limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the

Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common

law, and all related and/or supporting case law.  If the decedent had lived, the decedent would have

been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and

obtain remedies and damages provided by Texas and federal law.  Plaintiffs incorporate this

remedies section into all sections in this complaint asserting cause(s) of action.

C.      Cause of Action Against Harrison County and SHP Under 42 U.S.C. § 1983 for
        Violation of Constitutional Rights

126.    In the alternative, without waiving any other causes of action pled herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all other

allegations herein (including all allegations in the "Factual Allegations" section above) to the

extent they are not inconsistent with the cause of action pled here, Defendants Harrison County

and/or SHP are liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to

42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily

limited to those to receive reasonable medical/mental health care, to be protected, and/or not to be

punished as a pre-trial detainee.  These rights are guaranteed by at least the 14th Amendment to the

United States Constitution.  Pretrial detainees are entitled to be protected and not to be punished

at all, since they have not been convicted of any alleged crime resulting in their incarceration.

Regardless, Plaintiffs rely on the court to apply the correct constitutional guarantees to the facts pled.

127.    The County's and SHP's employees and agents acted or failed to act under color of state law at all relevant times.  The County's and/or SHP's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs.

128.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker(s) at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

129.    The County and/or SHP were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act and/or omissions claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the court makes the determination. Deliberate indifference is not an element of a conditions of confinement claim. The County and/or SHP also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiffs are not

conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's and/or SHP's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

130.    Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

131.    Plaintiffs and any other wrongful death beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations. Mr. Young seeks such damages as a result of the wrongful death of his mother. The County's and/or SHP's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by this person, for which he individually seeks compensation:

- past mental anguish and emotional distress suffered by Mr. Young resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Mr. Young resulting from and caused by the decedent's death; and

- loss of companionship and/or society, as applicable, that Mr. Young would have received from the decedent.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.    Concluding Allegations and Prayer

A.    Conditions Precedent

132.    All conditions precedent to assertion of all claims herein have occurred.

B.    Use of Documents at Trial or Pretrial Proceedings

133.    Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.    Jury Demand

134.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

135.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and/or below in this pleading:

    a)    actual damages and including but not necessarily limited to for:

- the decedent's medical expenses;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by Mr. Young resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Mr. Young resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish;

- the decedent's loss of life and/or loss of enjoyment of life; and

- Mr. Young's loss of companionship and/or society with the decedent;

b)    reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)    court costs and all other recoverable costs;

d)    prejudgment and postjudgment interest at the highest allowable rates; and

e)    all other relief, legal and equitable, general and special, to which Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


      /s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Jordan A. Shannon
Louisiana Bar No. 37868
jordan.shannon@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for Plaintiffs